UNITED STATES, Appellant

v

DAVID M. ELLMAN, Cadet, U. S. Military Academy, Appellee

9 USCMA 549, 26 CMR 329

No. 11,341

Decided. September 5, 1958

Major Thomas J. Nichols argued the cause for Appellant, United States. With him on the brief were Lieutenant Colonel John G. Lee and First Lieutenant William H. Keniry.

Captain John F. Christensen argued the cause for Appellee, Accused. With him on the brief was Colonel James Garnett.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

This case reaches us through certification of The Judge Advocate General of the Army to determine whether a cadet may be punitively discharged by means other than a dismissal from the service. The accused, a member of the United States Corps of Cadets, was tried by a general court-martial at West Point, New York, on charges of wrongful appropriation and absence without leave. The accused pleaded and was found guilty of the offenses charged. After receiving evidence in mitigation the court went into closed session but shortly thereafter reopened, at which time the following colloquy occurred:

"PRESIDENT: The court would like to have the law officer explain to them what are the implications of dismissal from the service and what are the various discharges that the court has open to us to adjudge in this case.

"LAW OFFICER: I'll answer the second question first, sir. The only type of punitive discharge which the court may adjudge in this case is a dismissal from the service. The court may not adjudge a dishonorable discharge or a bad conduct discharge in this case because the accused is a Cadet.

"DEFENSE COUNSEL: Sir, the defense counsel objects to the instruction of the law officer on the basis that the Manual does not prescribe specifically that such discharges may not be adjudged by a court in the case of a Cadet.

"LAW OFFICER: Your objection will be noted for the record."

After further deliberation, the court sentenced the accused to be dismissed from the service and to forfeit all pay and allowances. The board of review affirmed the findings of guilty but set aside the sentence concluding, inter alia, that the law officer had erred in informing the court-martial that dismissal was the only form of punitive separation applicable to cadets. Or as the board more emphatically put it:

". . . While we recognize that, traditionally, dismissal has been the type of separation employed in cases

of Cadets convicted by courts-martial, we are unable to find any authority that would preclude a Cadet from receiving a bad conduct discharge, if the court-martial deemed such form of separation appropriate in a particular case. Since the bad conduct discharge is relatively new in the Army, dating only from the 1948 amendments to the Articles of War, it is not surprising that there are no reported decisions on this matter. We have not been cited to anything in the legislative history of that statute which would indicate an intent to prohibit the imposition of a bad conduct discharge upon a Cadet. Further, we perceive no cogent reason why these young, and ofttimes immature, individuals should if separated for misconduct be in all cases given a form of discharge which will tend to stigmatize them permanently and to handicap if not preclude them from qualifying themselves for useful careers in other fields. In short, we find no sufficient indication that either the Congress or the President intended to impose such requirement."

Despite the fact that a bad-conduct discharge was not an authorized means of punitive separation until 1948, we cannot arrive at the answer to our inquiry with the same brevity as did the board of review in its decision. Rather it appears to us that the root of our inquiry must be to determine the status of a West Point cadet in relation to the Uniform Code of Military Justice.

Historically, the status of a cadet has been many times questioned since the establishment of the United States Military Academy at West Point. 2 Stat 132, 137 (1802). In an early advisory opinion Attorney General Wirt reasoned that cadets "are enlisted soldiers; they engage, like soldiers, to serve five years, unless sooner discharged; they receive the pay, rations, and emoluments of sergeants; they are bound to perform military duty in such places and on such service as the commander in chief of the army of the United States shall order." Therefore, in his opinion, they were constitutionally subject to the rules and articles of war and to trials by court-martial. 1 Atty Gen 276, 290 (1819).

This view did not reflect the concepts of a succeeding Attorney General for in 1855 Jefferson Davis, then Secretary of War, asked Attorney General Cushing whether a cadet was an officer or soldier and he received this reply:

". . . [A noncommissioned officer] is never more nor less than an enlisted soldier certified for the time being as a sergeant or corporal. That is a condition, which, in no possible view, can be considered the *status* of a cadet of the Military Academy.

·    ·    ·    ·    ·

"In a word, it is impossible to shut out for consideration the great fact that the cadets constitute a peculiar corps, the legal condition of whose members is to be gathered from the statutes and the regulations specially providing for the creation and government of the Military Academy. They are not enlisted soldiers, but are 'engaged' by a special act of 'engagement,' after having been carefully selected with reference to their unchangeable destination, which is, at the conclusion of a thorough military education, if they continue in the service, to become 'commissioned officers' of the Army. They cannot be compelled to serve in the field as 'privates,' or as 'non-commissioned officers.' Nay, they cannot be made such, even with their own consent, without first ceasing to be cadets. Their condition from the beginning is that of *future officers* never that of future sergeants, corporals, or privates. To use a familiar term of the common law in regard to other matters, they are simply *inchoate* officers, and as such entitled in all possible circumstances to certain of the legal rights appertaining to the condition of 'officers' of the Army as distinguished from 'non-commissioned officers' and privates.

"I think, for these reasons, that the action of a court martial on the cadets of the Military Academy has its limitations in their peculiar character. They cannot be treated as mere 'privates' or as technical 'non-

commissioned officers.' They must be treated as quasi commissioned officers." [7 Atty Gen 323, 331-332 (1855).]

See also 16 Atty Gen 611 (1878). Davis, Treatise on Military Law, page 22 (1898).

Regardless of the merits of the two conflicting opinions neither is in opposition to an 1829 holding that cadets could not serve as members of a general court-martial which, under the 64th Article of War, 2 Stat 359 (1806), and subsequent enactments, provided that the court be composed of commissioned officers. 2 Atty Gen 251 (1829); Benet, Treatise on Military Law, page 41 (1868).

The classification of quasi-commissioned officers characterized by Attorney General Cushing finds support in both legislative and judicial departments. For example, Revised Statutes § 1326 (1873), giving the Superintendent of the Military Academy the power to convene general courts-martial and execute imposed sentences, provides that no sentence of *dismissal* or *suspension* could become operative until formally confirmed by the President of the United States and, "where the Superintendent is the 'accuser' or 'prosecutor' of a cadet whose trial is contemplated, recourse must be had to the President for the ordering of the court, *as in the analogous case of the 'officer' referred to in the 2d clause of Art. 72.*" Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, page 69. (Emphasis supplied.) On the other hand, a cadet was considered not an officer in the Army within the intendment of certain statutes prohibiting dismissals in time of peace except after trial and conviction by court-martial. Hartigan v United States, 196 US 169, 49 L ed 434, 25 S Ct 204 (1905).

Although our inquiry deals with the status of an Army cadet, it is interesting to note that Naval midshipmen, then referred to as cadets, were also in a class by themselves for in 1877 it was held they were not subject to Naval court-martial jurisdiction. Concerning their status, the Attorney General had this to say:

". . . There can be no liberal construction of the terms which give jurisdiction to courts-martial. Mr. Wirt's celebrated opinion (1 Opin., p. 276) has rendered this familiar to military men in this country. That opinion demonstrated that cadets at West Point are liable to court-martial, by quoting various statutes which expressly so provided. The whole process of his reasoning is equally convincing that no mere implication can subject students at Annapolis to this jurisdiction. This puts an end to the discussion; for no statute has provided in words that they shall be subject to such jurisdiction, except that of 1874, chap. 453, upon 'hazing.'

"Cadets at Annapolis, therefore, not being in general liable to court-martial, are consequently not entitled to a privilege which (art. 36, *supra*) evidently is given only to such as are liable in general." [15 Atty Gen 634 (1877).]

But see Act of March 2, 1895, 28 Stat 838, 34 USC (1946 ed) § 1061, which apparently altered this situation.

These historical traditions, concepts and enactments have cast their impression on modern military jurisprudence. In order to eliminate the differences between the services, both cadets and midshipmen are today explicitly subject to the Uniform Code of Military Justice. See Article 2(2), 10 USC § 802. Their status has been equalized, but they can still be characterized as quasi-officers. Under present law for certain infractions, each can be suspended or dismissed from their respective Academies. Dismissal of course, had traditionally been the method of punitive discharge imposed against officers. See United States v Alley, 8 USCMA 559, 25 CMR 63; United States v Bell, 8 USCMA 193, 24 CMR 3.

The foregoing development compels the conclusion that, prior to the enactment of the Uniform Code of Military Justice, cadets were considered neither officers nor enlisted men. They belonged to a unique class. Our problem, therefore, is to determine whether Congress, when it enacted the Code, in-

**551**

tended to require those who offended against the law to be separated from the service by the means designated for officers or enlisted men, or both. A careful reading of the Code causes us to conclude that Congress clearly disclosed its intent to bracket them with officers and not have their status, rights, privileges and obligations vary from day to day. A reference to various sections of the Code is necessary to establish the base for our conclusion.

A cadet, along with a midshipman, flying cadet, warrant and commissioned officer, is not subject to summary court-martial, but an enlisted man is amenable to its jurisdiction. Article 20, Uniform Code of Military Justice, 10 USC § 820, states that rule as follows:

"Subject to section 817 of this title (article 17), summary courts-martial have jurisdiction to try persons subject to this chapter, except officers, cadets, aviation cadets, and midshipmen, for any noncapital offense made punishable by this chapter."

A cadet is linked with officers and dismissals under Article 66(b), 10 USC § 866, which provides:

"The Judge Advocate General shall refer to a board of review the record in every case of trial by court-martial in which the sentence, as approved, affects a general or flag officer or extends to death, dismissal of a commissioned officer, cadet, or midshipman, dishonorable or bad-conduct discharge, or confinement for one year or more."

Under Article 71(b), 10 USC § 871, he is given the same appellate review as an officer. That Article states:

"No sentence extending to the dismissal of a commissioned officer (other than a general or flag officer), cadet, or midshipman may be executed until approved by the Secretary concerned, or such Under Secretary or Assistant Secretary as may be designated by him."

Again, his conduct is measured by the same standards as those of an officer, for Article 133, 10 USC § 933, has this to say:

"Any commissioned officer, cadet, or midshipman who is convicted of conduct unbecoming an officer and a gentleman shall be punished as a court-martial may direct."

The Article is not applicable to an enlisted man and by specifically including cadets within its purview, Congress must have intended them to be punitively treated in the same manner as officers.

Turning now to Article 71, supra, we see that it provides different modes of approval for various court-martial sentences: those sentences extending to death or involving a general or flag officer must be approved by the President; those sentences extending to dismissal of an officer (other than a general or flag officer), cadet or midshipman must be approved by the Secretary of the Department or his representative; those sentences including dishonorable discharge, bad-conduct discharge, or confinement for one year need only be affirmed by the board of review unless an appeal is taken to this Court; all other sentences may be approved by the convening authority.

It is a cardinal rule of statutory construction that all parts of a single legislative enactment should be construed together and that an interpretation which renders the act confusing or uncertain should be avoided. In that connection, it is evident that Congress sought to create an orderly appellate process in which final affirmation could be effected at four levels. A sentence separating officers and cadets from the service must reach the level of a Secretary of a Department before it can be executed, while enlisted men who do not appeal to this Court can be separated after their conviction has been affirmed by a board of review. Under defense counsel's theory, a cadet who is punitively separated from the service by dismissal obtains appellate rights not available to one who is separated by a bad-conduct discharge. We find this construction would make the act confusing and dependent upon the sentence of a court. Certainly that is unnecessary and undesirable, especially when no substantial benefits inure to a cadet

receiving that type of discharge, for we are reminded that as to all veterans' benefits, except two, a person discharged with a bad-conduct discharge is treated exactly as a person separated by dismissal or dishonorable discharge. (The exceptions are relatively minor, (1) farm and farm housing loans, 50 Stat 522, as amended, and 63 Stat 413, 436 (1949); (2) preference housing, 61 Stat 193, 195 (1947), as amended, and 67 Stat 24 (1953).) The more reasonable conclusion to draw is that Congress intended that all cadets be treated uniformly by the Code and be punitively separated from the service only by dismissal.

Perhaps we may further support our conclusion by approaching the problem from another aspect. A bad-conduct discharge is a relatively new form of punitive punishment for Army personnel enacted under the Selective Service Act of 1948, 62 Stat 604, 630, investing a special court-martial under certain circumstances with power to adjudge that form of sentence. An officer or warrant officer could be tried by that type of court, but the President prohibited the imposition of that form of discharge on an officer or warrant officer. If the latter is separated, it must be by means of a dishonorable discharge. Paragraph 116c, Manual for Courts-Martial, U. S. Army, 1949, states:

". . . an officer can not be reduced in grade, such as from captain to first lieutenant, or to the grade or status of a warrant or noncommissioned officer, or sentenced to bad conduct discharge, or sentenced to confinement at hard labor unless the sentence includes dismissal, or sentenced to hard labor without confinement in any case. Similar limitations apply in the case of a warrant officer. The separation from the service of a warrant officer by sentence of court-martial is effected by dishonorable discharge."

Similar language is repeated in paragraph 126d, Manual for Courts-Martial, United States, 1951. It would thus appear that the use of bad-conduct discharges was limited to enlisted men and that belief is supported by Army regulations. The only references to a bad-conduct discharge by the Department of the Army found under regulations providing for personnel separations refer to enlisted men. AR 635–204 (1956) provides:

"1. When authorized. . . . b. An enlisted person will be discharged with a bad-conduct discharge pursuant only to an approved sentence of a general or special court-martial imposing a bad-conduct discharge. See MCM 1951, paragraphs 14b, 15b, and 127."

and AR 635–5 Appendix II (1956), which states that a bad-conduct discharge is to be used upon enlisted men only.

In the same vein we may refer to one recent board of review decision, and its conclusion is found in these words, "Thus it is apparent that from its very inception that imposition of a bad conduct discharge has been restricted to enlisted men. Its use to effect the punitive separation of officers or warrant officers from the service is without statutory sanction." United States v Morlan, 24 CMR 390.

In summation then, we are of the opinion that a cadet traditionally is upon a different plane than an enlisted man. Albeit he is not a commissioned officer yet, he is, in the words of Attorney General Cushing, an inchoate officer. His conduct is measured with the same standard as used for an officer, and the Code gives him certain privileges which are not the enlisted man's lot to enjoy. His separation from the service, then, should not be equated with that of an enlisted man. This being the case, the board of review erred in holding that a cadet may be punitively separated by a bad-conduct discharge. Therefore, the decision of the board is reversed, and the record of trial is returned to The Judge Advocate General of the Army for action not inconsistent with this opinion.

Chief Judge QUINN and Judge FERGUSON concur.