United States Court of Appeals,

Fifth Circuit.

No. 93-3774.

Leonce J. MILLER, III, Plaintiff-Appellant,

v.

UNITED STATES of America, Defendant-Appellee.

Jan. 13, 1995.

Appeal from the United States District Court for the Eastern District of Louisiana.

Before JONES and DeMOSS, Circuit Judges, and BUNTON,[*] District Judge:

BUNTON, District Judge.

Leonce Miller appeals the district court's dismissal of his negligence action against the United States, claiming the court's finding that his injuries arose during the course of activity incident to his military service was erroneous as a matter of law. Because we agree with the district court's conclusion that it lacked subject matter jurisdiction over Miller's claims, we affirm the dismissal.

## I. Facts

Miller received an appointment to the United States Naval Academy in Annapolis, Maryland, in March of 1991. As required, he reported to the Academy on July 9, 1991, and began participation in the Academy's orientation program as a "plebe," an incoming freshman midshipman. The orientation program is called "plebe

---

[*]District Judge of the Western District of Texas, sitting by designation.

1

summer" and is the beginning of the process of training midshipmen to become Navy officers.  During the training, plebes are taught basic skills in seamanship, navigation, sailing and small boat handling, signaling, infantry drill, and small arms familiarization.  Plebes are subject to rigorous physical and mental demands in an effort to develop their leadership ability, motivation, integrity, and physical skills and strength.

During the course of the program, on July 23, Miller was injured when the boom of a laser sailboat struck him in the back of the head, knocking him unconscious.  He was subsequently admitted to the National Naval Medical Center in Bethesda, Maryland, where he was diagnosed with "conversion disorder."  In August of 1991, Miller was categorized by a Navy neurologist at the Medical Center as "not fit for full duty" and "unsuitable for military service."  In a Counsel and Guidance Interview Record, Miller was deemed "unfit for naval service."  He was ordered to the Medical Center's psychiatric ward where he remained until November 4, 1991.  Miller alleges that during his hospitalization he suffered serious mental and emotional injuries because of his doctors' wrongful diagnosis and the inadequate medical treatment he received.  During his stay at the Medical Center, a Navy Medical Board recommended that he be disenrolled from the Naval Academy.  Miller was honorably discharged from the United States Navy on February 21, 1992, for "physical disability not existing prior to entry on active duty."

Miller filed an administrative claim with the United States Navy on December 29, 1992, alleging the injuries he sustained as a

result of the sailing accident were caused by various acts of negligence on the part of the United States. He also alleged a separate claim of improper medical care by the United States based on his treatment at the Medical Center. Both claims were rejected by the United States. Miller subsequently sued the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(a), 2671-80 (the FTCA); the Suits in Admiralty Act, 46 U.S.C.App. §§ 741-752; and the Public Vessels Act, 46 U.S.C.App. §§ 781-790. The United States requested that the district court dismiss Miller's claims for lack of subject matter jurisdiction. The court did so, concluding that because Miller's injuries arose during the course of activity incident to his military service as a midshipman at the Academy, his claims fell within the *Feres* exception to the United States' waiver of tort liability.

Miller appeals the court's conclusion his cause of action is barred by the *Feres* doctrine claiming the court did not adequately address his arguments that his injuries did not occur during activities incident to military service. He argues that he was not a member of the Navy and not engaged in military service and that, even if he could be considered a service member, the *Feres* doctrine is not applicable since he was not on active duty at the time his injuries arose.

## II. Discussion

The *Feres* doctrine is a judicially created exception to the broad waiver of immunity established by the FTCA. The essence of the doctrine is that "the Government is not liable under the

3

Federal Tort Claims Act for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service." *Feres v. United States,* 340 U.S. 135, 146, 71 S.Ct. 153, 159, 95 L.Ed. 152 (1950). The *Feres* doctrine applies with equal force to bar actions by service members under the Suits in Admiralty Act and the Public Vessels Act. *Beaucoudray v. United States,* 490 F.2d 86 (5th Cir.1974).

"[T]he question of what activity invokes the *Feres* doctrine is not a question of fact ... but an issue requiring *de novo* appellate review." *Adams v. United States,* 728 F.2d 736, 738 n. 3 (5th Cir.1984) (citing *Parker v. United States,* 611 F.2d 1007, 1008 n. 1 (5th Cir.1980)).

Miller's first ground for disputing the district court's finding that his accident was incident to his military service as a midshipman at the Academy is that he was not, in fact, a member of the military service at the time of the accident. Miller characterizes his status at the Academy as merely that of a student in training for future military service. He argues that because he was only a freshman midshipman, he owed no obligation to the military establishment at the time of his accident and that he was under no compulsion to participate in the sail training exercise but could have disenrolled from the Academy without penalty. He also draws our attention to the fact that time spent in the military academies is not counted in computing the length of active military service. 10 U.S.C. § 971(b).

The Government, on the other hand, argues that the sail

4

training exercise was mandatory and an essential part of Miller's training as a midshipman, that Miller was subject to the Uniform Code of Military Justice at all times, and that, although midshipmen during the first two years of enrollment at the Naval Academy are under no obligation to remain at the Academy and may voluntarily disenroll at any time without having to serve active duty, Miller could have resigned his appointment only upon approval of the Chief of Naval Personnel. A midshipman is a "member of the naval service," 10 U.S.C. 5001(a)(3), and, as such, has committed the crime of Absence Without Leave if he fails to go to his appointed place of duty at the time prescribed, or absents himself from the Academy without permission. 10 U.S.C. § 886.

The United States suggests we can find further evidence of Miller's status as an active duty service member in that he was appointed a Midshipman in the United States Navy by the President of the United States, he executed an oath of office pursuant to the appointment, and as a midshipman, Miller was entitled not only to a free education but to midshipman pay at the rate of $543.90 per month. He was covered by the Navy's Servicemen's Group Life Insurance Policy. The Government also offers various textual support for its argument. *See, e.g.,* 10 U.S.C. § 101(d)(1).

We reject Miller's claims that, as a freshman midshipman, he could not be considered engaged in military service. Midshipmen are in training for future military service *as officers, United States v. Ellman,* 26 C.M.R. 329, 330, 1958 WL 3370 (C.M.A.1958), and attendance at the United States Naval Academy is expected to

5

lead to active military service as an officer. "[C]onduct in combat inevitably reflects the training that precedes combat...." *Chappell v. Wallace,* 462 U.S. 296, 300, 103 S.Ct. 2362, 2366, 76 L.Ed.2d 586 (1983). The purpose of the Academy is to train men and women to hold positions as officers in future service to their country, not merely to educate them so that they may later participate successfully in civilian life. It is no surprise, then, that "a cadet in the Military or Naval academies has always been considered to be a member of the military forces of the United States...." *Travis v. United States,* 146 F.Supp. 847, 850 (Ct.Cl.1956). "[W]hile the time spent as a cadet in the Military Academy may not be counted in computing length of service, such service is service in the military forces of the United States." *Id.* at 851. Because Miller was in the military service when the accident occurred, we must now decide whether the injuries he claims arose out of or were in the course of activity incident to that service.

Miller relies, ultimately, on his contention that he was not on *active* duty military service at the time of the sailing accident and, therefore, the accident was not "incident to service" and the *Feres* doctrine does not apply. The United States, on the other hand, claims Miller was "on duty" and "under instruction" at the time of the accident and, thus, his injuries were sustained incident to active duty military service. Although the United States appears to accept the logic, if not the premise, of Miller's argument, we do not.

6

We have previously stated we require "a case-by-case assessment of the totality of the circumstances to determine whether the injured service member's particular status at the time of injury was such as to bring into play" the Government's interest in regulating "the unique relationship of servicemen to the [G]overnment." *Adams,* 728 F.2d at 738-39. To aid in that assessment, we have articulated certain factors, embodied in what we have called the *Parker* test, which should be considered in determining whether a serviceman's injuries were "incident to service:"

> the duty status of the serviceman, the site of injury, and the activity of the serviceman at the time of the injury. While no single factor is necessarily dispositive, our applications of the *Parker* test—and, indeed, the results of our cases decided before *Parker's* exposition of it—demonstrate that the duty status of the service member is usually considered the most indicative of the nature of the nexus between him and the [G]overnment at the time of injury and is therefore the most important factor.

*Adams,* 728 F.2d at 739 (citing *Parker,* 611 F.2d at 1013-15). While we do not deny the importance of the service member's duty status, we believe the parties' almost exclusive focus on whether or not Miller was on *active* military duty at the time of his injuries is entirely too narrow and does not adequately address the most important rationale for the doctrine—the need to exercise a great deal of caution before requiring or allowing the civilian bench and bar to analyze and, in the end, judge military decisions. That rationale is incorporated in the *Parker* test's concentration on the relationship between the service member and the military expressed in the consideration of the three factors: the status of the

7

service member, the site of the injury, and the activity of the service member at the time of the injury. In the end, a court must determine whether an activity is incident to service by "examining the totality of circumstances...." *Id.* at 1013. This examination should address not only *Parker's* three factors but should take into account the rationale behind the *Parker* test.

A review of the various rationale advanced over the years supports our decision to reject an approach which overemphasizes the duty status prong of the *Parker* test and to re-focus the inquiry on whether or not Miller's injuries "ar[ose] out of or [were] *in the course of activity incident to service.*" *Feres,* 340 U.S. at 146, 71 S.Ct. at 159 (emphasis added). The history of the doctrine reveals that the question of what activities are "incident to service" has undergone "a rather complex evolution" but that the "overall trend [of the evolution] is unmistakable." *Jackson v. Brigle,* 17 F.3d 280, 282 (9th Cir.), *cert. denied,* --- U.S. ----, 115 S.Ct. 187, 130 L.Ed.2d 121 (1994). "The test has been broadly construed to immunize the United States and members of the military from any suit which may "intrude in military affairs,' "second-guess[ ] military decisions,' or "impair[ ] military discipline.' " *Id.* (quoting *Stauber v. Cline,* 837 F.2d 395, 398 (9th Cir.), *cert. denied,* 488 U.S. 817, 109 S.Ct. 55, 102 L.Ed.2d 33 (1988). Although this Court discussed the evolution of the *Feres* doctrine in *Parker,* a synopsis of that evolution is useful to our analysis of its application to Miller's claims.

The doctrine had its roots in the Supreme Court's decision in

8

*Brooks v. United States,* 337 U.S. 49, 69 S.Ct. 918, 93 L.Ed. 1200 (1949), in which the Court held that a soldier on furlough, although in the armed services, is not precluded from bringing suit under the FTCA. In *Brooks,* the Court was dealing with a service member whose injuries had nothing to do with his military career and were not caused by his service in the military. The Court expressed its opinion that "[w]ere the accident incident to the [service member's] service, a wholly different case would be presented." *Id.* at 52, 69 S.Ct. at 920. One year later, *Feres* presented that wholly different case. The Court in *Feres* found service members who were not on furlough but were on active duty at the time of their injury were injured incident to their military service and thus precluded from suing the Government under the FTCA. In *Feres* itself and in cases following that decision, the Court re-emphasized, explained, contracted, and expanded upon various rationales for the doctrine.

First, in formulating the doctrine, the Court reasoned that the "parallel private liability required by the FTCA"[1] was lacking in suits by service members against the Government for injuries sustained incident to their military service. *Feres,* 340 U.S. at 141-142, 71 S.Ct. at 156-157. However, this "parallel private liability" rationale was explicitly rejected by the Court in later decisions. *Rayonier, Inc. v. United States,* 352 U.S. 315, 319, 77 S.Ct. 374, 376-377, 1 L.Ed.2d 354 (1957); *Indian Towing Co. v.*

---

[1]The FTCA makes the United States liable "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674.

9

*United States,* 350 U.S. 61, 66-69, 76 S.Ct. 122, 125-27, 100 L.Ed. 48 (1955). Second, the Court reasoned that because of the "distinctively federal"[2] character of the relationship between the United States and its armed forces, allowing "the law of the place where the [negligent] act or omission occurred"[3] to affect the liability of the United States to individual service members would be inconsistent with the uniformity for which the military strives. *Feres,* 340 U.S. at 142-144, 71 S.Ct. at 157-158; *United States v. Johnson,* 481 U.S. 681, 689, 107 S.Ct. 2063, 2068, 95 L.Ed.2d 648 (1987). This ground for the doctrine was later recognized as "no longer controlling." *United States v. Shearer,* 473 U.S. 52, 58, n. 4, 105 S.Ct. 3039, 3043, n. 4, 87 L.Ed.2d 38 (1985). Third, the Court found that "the existence of ... generous statutory disability and death benefits" for service members obviated the need for application of the FTCA whose primary purpose " "was to extend a remedy to those who had been without.' " *Johnson,* 481 U.S. at 689-90, 107 S.Ct. at 2068 (quoting *Feres,* 340 U.S. at 140, 71 S.Ct. at 156). Although this ground for barring recovery under the FTCA by service members is also "no longer controlling," *Shearer,* 473 U.S. at 58 n. 4, 105 S.Ct. at 3043 n. 4, it is still a factor taken into consideration by courts when addressing the question of whether or not *Feres* bars a service member's cause of action. This Court has cautioned that "[t]he existence and

_____

[2]*United States v. Standard Oil Co.,* 332 U.S. 301, 305, 67 S.Ct. 1604, 1607, 91 L.Ed. 2067 (1947).

[3]28 U.S.C. § 1346(b).

acceptance of ... benefits is not, however, an accurate barometer for the threshold question of whether the activity is "incident to service.' " *Parker,* 611 F.2d at 1012.

Finally, but most importantly, the Supreme Court has explained that

> *Feres* and its progeny indicate that suits brought by service members against the Government for injuries incurred incident to service are barred by the *Feres* doctrine because they are the "*type[s]* of claims that, if generally permitted, would involve the judiciary in sensitive military affairs at the expense of military discipline and effectiveness.'

*Johnson,* 481 U.S. at 690, 107 S.Ct. at 2069 (quoting *United States v. Shearer,* 473 U.S. at 59, 105 S.Ct. at 3043-44 (emphasis in original)); *see also United States v. Brown,* 348 U.S. 110, 112, 75 S.Ct. 141, 143, 99 L.Ed. 139 (1954). In recent times, courts seem to have found greatest support for the *Feres* doctrine in this reasoning that "a suit based upon service-related activity necessarily implicates the military judgments and decisions that are inextricably intertwined with the conduct of the military mission." *Johnson,* 481 U.S. at 691, 107 S.Ct. at 2069. Commitment to military service, grounded as it is in obedience to orders and duty and loyalty to one's country, could be undermined by allowing suits against the Government for service-related injuries. *Id.* The Supreme Court has stressed that "whether the suit requires the civilian court to second-guess military decisions" or "goes directly to the "management' of the military" and "whether the suit might impair essential military discipline" is the "best explanation" for the *Feres* doctrine. *Shearer,* 473 U.S. at 57-58, 105 S.Ct. at 3042-43 (citing *Stencel Aero Engineering Corp. v.*

11

*United States,* 431 U.S. 666, 673, 97 S.Ct. 2054, 2058-59, 52 L.Ed.2d 665 (1977) and *Chappell,* 462 U.S. at 299-300, 103 S.Ct. at 2365-66); *see also United States v. Muniz,* 374 U.S. 150, 162, 83 S.Ct. 1850, 1857-58, 10 L.Ed.2d 805 (1963). This Court has recognized that this concern for preserving military discipline is "the most important consideration in any single case." *Scales v. United States,* 685 F.2d 970, 973 (5th Cir.1982). Suits in which "commanding officers would have to stand prepared to convince a civilian court of the wisdom of a wide range of military and disciplinary decisions" are an improper interference by the judiciary in the management of the armed forces. *Shearer,* 473 U.S. at 58, 105 S.Ct. at 3043. "[C]omplex, subtle, and professional decisions as to the composition, training, ... and control of a military force are essentially professional military judgments" and are best committed to the legislative and executive branches of the Government and not to civilian courts. *Chappell v. Wallace,* 462 U.S. at 302, 103 S.Ct. at 2366-67 (quoting *Gilligan v. Morgan,* 413 U.S. 1, 10, 93 S.Ct. 2440, 2445-46, 37 L.Ed.2d 407 (1973)). *See also Morey v. United States,* 903 F.2d 880, 882 (1st Cir.1990) (adjudicating plaintiff's claims would "require the court to delve into questions of military decision making.").

The fact that an injured service member is not on active duty when the injury occurs does not preclude application of the *Feres* doctrine as the parties suggest. *Scales,* 685 F.2d at 973. Keeping in mind that "duty status is to be viewed as a continuum from actual active duty at one extreme to discharge at the other,"

12

*Adams,* 728 F.2d at 739, we are not persuaded that "incident to service" necessarily denotes an "active duty" status or even that the service member is currently "in service" in the sense that he or she is actively pursuing the military duties of a soldier at the time of injury. We therefore reject the parties' attempts to make the dispositive question on this issue whether or not Miller was on active duty.

If we view the continuum in light of the best rationale for the *Feres* doctrine—that the propriety of military decisions and actions are committed to the military and not to the courts—it becomes apparent that injuries are "incident to service" if an inquiry into the Government's liability for those injuries would require civilian courts to second-guess military decisionmaking. *Stencel,* 431 U.S. at 671-672, 97 S.Ct. at 2057-2058.

This test should not be given as constricted a scope as the parties imply. The Ninth Circuit has recognized that "practically any suit that "*implicates* ... military judgments and decisions' runs the risk of colliding with *Feres.*" *Persons v. United States,* 925 F.2d 292, 295 (9th Cir.1991) (emphasis added) (quoting *Johnson,* 481 U.S. at 691, 107 S.Ct. at 2069); *see also Jackson v. Brigle,* 17 F.3d at 282. The Seventh Circuit has "consistently found that a servicemember's injury is incident to military service whenever the injury is incurred while the individual is on active duty *or* subject to military discipline." *Stephenson v. Stone,* 21 F.3d 159, 162 (7th Cir.1994) (emphasis added) (citing *Collins v. United States,* 642 F.2d 217, 219 (7th Cir.), *cert. denied,* 452 U.S. 964,

13

101 S.Ct. 3115, 69 L.Ed.2d 975 (1981)).  Justice Scalia's analysis in *United States v. Stanley,* 483 U.S. 669, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987), underscores the breadth of the "incident to service" test:

> A test for liability that depends on the extent to which particular suits would call into question military discipline and decisionmaking would itself require judicial inquiry into, and hence intrusion upon, military matters.  Whether a case implicates those concerns would often be problematic, raising the prospect of compelled depositions and trial testimony by military officers concerning the details of their military commands.  Even putting aside the risk of erroneous judicial conclusions (which would becloud military decision making), the mere process of arriving at correct conclusions would dispute the military regime.  The "incident to service" test, *by contrast,* provides a line that is relatively clear and that can be discerned with less extensive inquiry into military matters.

*Id.* at 682-683, 107 S.Ct. at 3063 (emphasis added).

As we noted earlier, attendance at the United States Naval Academy is expected to lead to active military service as an officer and the purpose of the Academy is to train men and women to hold positions as officers in the military services.  We believe that is all that is required to find that their non-discretionary activities at these institutions—activities which are conducted under the auspices of the military establishment and during which the midshipman or cadet is subject to military discipline—are "incident to service."  A finding that Miller was on active duty at the time of his accident is not necessary to a determination that his injury occurred during activities that were incident to his military service.

Miller relies on *Brooks* and *Brown* to support his argument that one who is not on active duty is permitted to avail himself of the

14

benefits of the FTCA. We find little in these cases to recommend them for this proposition. In *Brooks,* as we have said, the Court was dealing with a service member whose injuries had nothing to do with his military career and were not caused by his service in the military. In *Brown,* the injury sued upon was "not incurred while [the serviceman] was on active duty *or* subject to military discipline" but while his status was that of a civilian. *Brown,* 348 U.S. at 112, 75 S.Ct. at 143 (emphasis added). Consequently, in neither of those cases would the factfinder have been required to scrutinize the orders or decisions of the military establishment in order to determine the Government's liability. In later commenting on the *Brown* decision, the Supreme Court concluded that "[a]lthough [*Brown* ] noted the military status of the tortfeasors, it did not rely on that fact." *Johnson,* 481 U.S. at 686 n. 7, 107 S.Ct. at 2066 n. 7. The Court concluded that it was the *broad* language of *Feres* and its progeny that was controlling. "[T]he language of the opinion, viewed as a whole is broad: "We know of no American law which ever has permitted a soldier to recover for negligence, against either his superior officers *or the Government he is serving.'* " *Id.* (quoting *Feres,* 340 U.S. at 141, 71 S.Ct. at 156-57 (emphasis added)). We think Miller's argument that these cases were decided in favor of the service members because they were *not* on active duty fails to take into account the significance of the fact that allowing these cases to go forward in civilian courts would not have implicated military decision-making.

We find support for this in later cases. For example, in

15

applying the *Feres* doctrine in *Bivens* actions, the Ninth Circuit has emphasized that the activities of both the service member and the alleged tortfeasor were "always under the direct command of active-duty military officers, that the parties' conduct was subject to military discipline and that the parties shared the same direct military relationships whether on civilian or military status." *Jackson v. Brigle*, 17 F.3d at 283 (citing *Stauber*, 837 F.2d 395). The Court concluded that addressing a plaintiffs' claims under those circumstances would "result in an impermissible intrusion upon military matters." *Id.* (quoting *Stauber*, 837 F.2d at 400). In *Stephenson*, the Seventh Circuit found it significant that the injuries occurred not only while the service member was on active duty, but while he was on military property, because of his relationship with the Government, and because of the "negligence of military personnel in the performance of official, military duties." 21 F.3d at 164. In *Parker*, this Court inquired into what the service member was doing at the time he was injured in an effort to determine whether his injuries were "incident to service." In finding that the plaintiff in that case was not engaged in activity incident to service, we found it relevant that he was not under military orders, not engaged in the performance of a military mission, and "not even attending to personal affairs, such as shopping, or engaging in activities arising from life on the base, such as recreational activities." 611 F.2d at 1014.

Although Miller opines that the United States' argument on this issue is "vague," we find a great deal of merit to the

16

Government's argument that the discovery and trial process would, were this case allowed to move forward in the district court, involve the court in military policy and decisions concerning the appropriate method of training the future commissioned officer corps of the Navy.  It is highly conceivable that discovery and trial could require other service members to publicly question and disagree with the orders and policies of their superiors.  This state of affairs would be inimical to the discipline which is so much a part of our armed forces.  Our courts have consistently recognized that "no military organization can function without strict discipline and regulation that would be unacceptable in a civilian setting." *Chappell,* 462 U.S. at 300, 103 S.Ct. at 2365 (citing *Parker v. Levy,* 417 U.S. 733, 743-744, 94 S.Ct. 2547, 2555-2556, 41 L.Ed.2d 439 (1974) and *Orloff v. Willoughby,* 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953)).

Miller calls attention to our decision in *Cortez v. United States,* 854 F.2d 723 (5th Cir.1988) for an example of this Court's willingness to read the "incident to service" test narrowly and to allow "numerous categories" of armed service members to file claims under the FTCA.  However, Cortez had been placed on Temporary Disability Retired List,[4] relieved of military duty, and allowed to return home.  His alleged improper medical treatment by military personnel "was not intended or likely to result in his return to

---

[4]"The nature of this status is a type of "limbo.'  A serviceman who is on the List is separated from the Army, but his final status is deferred pending additional medical evidence." *Craft v. United States,* 544 F.2d 468, 471 (1976).

17

active duty." *Id.* at 725. His "only military obligation was to report for the periodic reevaluations [of his medical condition]." *Id.* at 726. "Cortez was not hospitalized at the army medical center pursuant to a military order or mission, direct or indirect." *Id.* at 727. For these reasons, Cortez' injury was not connected with his military service.

Similarly, in *Harvey v. United States,* 884 F.2d 857 (5th Cir.1989), another medical malpractice case involving a service member who had been relieved of duty and had returned to civilian life but was not yet formally separated from the service, this court found that "neither the federal structure of the military nor the concern over military discipline" was implicated and that "Harvey's suit would not involve any issue pertaining to the command structure of the Air Force nor require us to second-guess any military order." *Id.* at 861.

It cannot be gainsaid that military discipline is the hallmark of the military academies. Plebe summer for midshipmen can be likened to basic training or boot camp for enlisted men—one of its main purposes to instill a sense of discipline in the midshipman and train the midshipman to subject himself to the commands of others, possibly in contravention of his own instincts. The Seventh Circuit placed great emphasis on the fact that an Air Force Academy cadet was subject to military discipline at the time of his injury and held that those injuries were incident to his military service. *Collins,* 642 F.2d at 220-221. Other courts have assumed that injuries to service members in the military academies arose

18

"incident to service" for purposes of application of the *Feres* doctrine. *See Archer v. United States,* 217 F.2d 548, 551 (9th Cir.), *cert. denied,* 348 U.S. 953, 75 S.Ct. 441, 99 L.Ed. 745 (1955) (a cadet being transported in a military airplane operated by military personnel "indicate[s] the usual transportation of a soldier in military service in line of duty").

*Collins* also found significant that the Air Force Academy cadet received veteran's benefits for his injuries. Although as a midshipman Miller is also entitled to certain military benefits[5] and may be treated at military hospitals, he argues that because he does not receive retirement or separation benefits for physical disability or retirement annuities, the *Feres* doctrine should not preclude him from attempting to recover damages under the FTCA. The Government relies heavily on the Seventh Circuit's reasoning that "the fact that cadets are subject to military discipline and are eligible for certain veterans' benefits strongly supports the finding that cadets, like other service personnel, are barred from bringing FTCA actions for service-related injuries." *Collins,* 642 F.2d at 220. The plaintiff-cadet in that case was receiving disability compensation and vocational rehabilitation payments. We reiterate that, although the receipt of veteran's benefits may be indicative of the duty status of a service member, it is not dispositive of the question whether the disability for which the

_____

[5]Miller is presently receiving disability compensation at the rate of $240 per month under the Department of Veterans' Affairs Codification Act, 38 U.S.C. § 101 *et seq.,* and will probably continue to collect compensation under the Act for the remainder of his life.

19

service member is receiving benefits was sustained "incident to service." We believe a proper determination of the question must rely more heavily, as we have said, on the effect of the lawsuit on military discipline.

Like the Air Force Academy cadet in *Collins,* Miller is considered a member of the armed forces. And, as in *Collins,* there is no dispute Miller's injury was incident to his service as a midshipman, regardless whether or not he was on active duty. We therefore find that the injuries Miller sustained as a result of the sailing accident were sustained "incident to service" and that he is precluded from suing the Government for these injuries by *Feres.*

Miller argues that even if we should find his sailing injuries were incurred "incident to service," the injuries he allegedly sustained as a result of improper medical care at the hands of the Government could not be considered "incident to service" since he had been deemed unfit for service at the time the injuries arose. The United States argues Miller remained on active duty until he was honorably discharged in February of 1992. We believe, again, the parties place too much emphasis on whether or not Miller was on active duty and that an analysis of this claim must also be grounded on the effect the claim would have on military discipline. In the context of claims of improper medical treatment by service members, this court has stated that "[i]f the [district] court must second-guess the judgment of military officers in assessing their treatment of a member of the armed

20

services, the claim will be deemed to have a disruptive effect on discipline and will be dismissed." *Scales,* 685 F.2d at 973. In these inquiries, as well, the district court's focus is not only on the duty status of the service member, but on the "type of examination that will be demanded of the district court." *Id.*

We agree with the Government that Miller's subsequent medical care and hospitalization at the Medical Center flowed directly from his training accident and occurred before any significant change in the status of his relationship to the Government. Although Miller was categorized as "unfit for naval service" on August 12, 1991, prior to his admission to the NNMC's psychiatric ward on August 22, 1991, he was not discharged from service until February 21, 1992. Although his duty status at the time of his admission to the psychiatric ward is undoubtedly a closer question, these claims must also be considered to have occurred incident to his military service as a midshipman. Once again, we must look not only to Miller's duty status, but at the totality of the circumstances. Any trial of the issues raised by the diagnosis of his injuries and his subsequent hospitalization would necessarily raise the same problems of intrusion on military affairs, second-guessing military medical policy concerning the treatment of midshipmen, and impairing military discipline.

Finally, Miller advances a policy argument for finding that the *Feres* doctrine should not bar his claims. He argues that because he is not receiving the same compensation, in the form of benefits, that is available to other service members, he should be

allowed to seek a greater recovery under the FTCA.  The fact that Miller is not receiving the compensation to which he believes he is entitled is not reason enough to circumvent the *Feres* bar to these types of lawsuits.  We agree with the Seventh Circuit that "[a]lthough they do not receive certain benefits, cadets [and midshipmen] enjoy the benefits of attendance at the service academies that are unavailable to regular members of the armed forces.  These and other differences between cadets and some other members of the military show only that the benefits provided by the armed services are available to those for whom they are appropriate."  *Collins,* 642 F.2d at 221.

The Supreme Court, although recognizing that the line drawn by the *Feres* doctrine—whether an injury is "incident to service"—may not be "fair" in terms of the compensation ultimately available to service members, has found "fairness" to be an inadequate justification "for changing the interpretation of a congressional statute, when Congress has failed to do so for almost 40 years." *Johnson,* 481 U.S. at 689 n. 9, 107 S.Ct. at 2068 n. 9.  The *Feres* doctrine has been reaffirmed by the Supreme Court many times since its inception in the face of strong criticism of the equity of the rule.[6]

---

[6]In *Johnson,* Justice Scalia expressed his strong opinion that "*Feres* was wrongly decided and heartily deserves the "widespread, almost universal criticism' it has received."  481 U.S. 681, 700-701, 107 S.Ct. 2063, 2074, (1987) (Scalia, J., joined by Brennan, Marshall, and Stevens, JJ., dissenting) (quoting *In re "Agent Orange" Product Liability Litigation,* 580 F.Supp. 1242, 1246 (E.D.N.Y.), *appeal dism'd,* 745 F.2d 161 (2d Cir.1984).  In *Bowers v. U.S.,* the Eighth Circuit held, "with a pronounced lack of enthusiasm," that pre-induction physicals are

We take this opportunity to remind Appellant that, although the benefits he receives may not be as much as those received by other service members, the recovery of those benefits is "swift [and] efficient," usually obviating the necessity for litigation *Stencel* at 673, 97 S.Ct. at 2058-59; *Feres,* 340 U.S. at 145, 71 S.Ct. at 158-59. In addition, we must not forget that "predicting the outcome of any damages suit—both with respect to liability and the amount of damages—is hazardous, whereas veterans' benefits are guaranteed by law." *Johnson,* 481 U.S. at 689 n. 9, 107 S.Ct. at 2068 n. 9. The law is often unfair when viewed from the perspective of any one individual. Unfairness, however, must often be tolerated if we are to devise, implement, and maintain a system of laws whose application is certain and just in the grand scheme of things. Whether the *Feres* doctrine can be described as such is, we feel, open to question in certain cases. However, any final determination of its justness must be left to a higher authority

---

activities incident to service, basing its decision on the fact that the relationship existing between the Government and the potential service member resulting from the pre-induction physical was "distinctively federal" and that the availability of a negligence action arising from a pre-induction physical would "involve the Judiciary in sensitive military judgments." 904 F.2d 450, 451-52 (8th Cir.1990). The Court reached this decision in spite of the fact that the plaintiff was not a member of the service at the time of the alleged injury, much less on active duty, and would receive no benefits or treatment from the Government. In *Hinkie v. United States,* 715 F.2d 96, 97 (3d Cir.), *cert. denied,* 465 U.S. 1023, 104 S.Ct. 1276, 79 L.Ed.2d 680 (1984), the Third Circuit reluctantly applied the doctrine because it had "no legal authority, as an intermediate appellate court, to decide the case differently." This Court has felt "compelled, however reluctantly, to ... dismiss ... claim[s] as barred by *Feres.*" *Scales v. United States,* 685 F.2d 970, 974 (5th Cir.), *cert. denied,* 460 U.S. 1082, 103 S.Ct. 1772, 76 L.Ed.2d 344 (1983).

than this Court. We therefore AFFIRM the district court's dismissal of Appellant's cause of action.