DENNY CHIN, Circuit Judge:
I respectfully dissent.
Assuming, as we must at this juncture of the case, that the allegations of the amended complaint are true, plaintiff-appellee Jane Doe was subjected to pervasive and serious sexual harassment, including rape, at the United States Military Academy at West Point (“West Point”). The harassment resulted from practices and policies that the individual defendants permitted to proliferate and, indeed, implemented or encouraged, depriving Doe of an equal education because of her gender. The amended complaint alleges that the individual defendants created, promoted, and tolerated a misogynistic culture, including by, for example, setting separate curriculum requirements for women and men (self-defense for first-year female cadets and boxing for first-year male cadets), requiring sexually transmitted disease testing for female but not male cadets, warning female cadets that it was their burden to spurn sexual advances from male cadets while openly speaking to male cadets about sexual exploits and encouraging them to take advantage of any opportunity to have sex, imposing inadequate punishment for offenders, and permitting sexually explicit, violent, and degrading group chants during team building exercises, with verses such as the following:
I wish that all the ladies/were bricks in a pile/and I was a mason/ I’d lay them all in style....
I wish that all the ladies/were holes in the road/and I was a dump truck/I’d fill ’em with my load....
I wish that all the ladies/were statues of Venus/and I was a sculptor/I’d break ’em with my penis.
App’x 15.
If West Point were a private college receiving federal funding or another public educational institution and allegations such as these were proven, there clearly would be a violation of Doe’s rights and she could seek recourse for her injuries. The Government argues, however, that the individual defendants are immune from suit because they are military officers. And while it acknowledges that “[sjexual assault in the military and at service academies cannot be tolerated,” it argues that Doe is a service member and that “service members may not sue their superiors for injuries that arise incident to military service,” Appellants’ Br. at 2, relying on the concept of intramilitary immunity as set forth in Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), and its progeny. The majority accepts the argument.
*51 I do not agree that the Feres doctrine applies, for in my view Doe’s injuries did not arise “incident to military service.” When she was subjected to a pattern of discrimination, and when she was raped, she was not in military combat or acting as a soldier or performing military service. Rather, she was simply a student, and her injuries were incident only to her status as a student. When she was raped, she was taking a walk on a college campus with another student, someone she thought was a friend. The actions and decisions she now challenges had nothing to do with military discipline and command; instead, she seeks recourse for injuries caused by purported failures on the part of school administrators acting in an academic capacity overseeing a learning environment for students.
While West Point is indeed a military facility, it is quintessentially an educational institution. As its website proclaims, it is “one of the nation’s top-ranked colleges,” and it provides its “students with a topnotch education.”[1] In my view, the Feres doctrine does not bar Doe’s equal protection claims. For these and other reasons discussed below, I would affirm the district court’s decision denying the individual defendants’ motion to dismiss the equal protection claim. Accordingly, I dissent.
I.
As alleged in the amended complaint, the facts are summarized as follows:
Doe is a former cadet who resigned from West Point in 2010 after completing two years. She grew up in a military family and graduated near the top of her class in high school. At West Point she “thrived academically, participated in extracurricular activities, and ranked high in her class.” App’x 14. Because she left West Point before the start of her third year, she never assumed active status and had no obligation to enlist as a soldier. See 32 C.F.R. § 217.6(f)(6)(ii)(A).[2] Her obligations to the military did not vest, and she was not contractually required to repay the cost of her education.
West Point has an enrollment of approximately 4,600 cadets and a faculty of some 600 individuals, of whom three-quarters are military personnel and one-quarter are civilian employees. Cadets live on-campus in dormitories all four years and eat in dining halls. The curriculum “is designed to train ‘officer-leaders of character to serve the Army and the Nation,’ ” App’x 3, and thirty-six majors are offered, including Politics, Art, Philosophy and Literature, Engineering, History, Physics and Sociology.[3] West Point is accredited by the *52 Middle States Commission on Higher Education, the accreditation unit for the Middle States Association of Colleges and Schools,[4] Cadets may participate in numerous extracurricular activities, including athletics, honor societies, academic competitions,- and musical groups. West Point fields athletic teams in twenty-four NCAA Division I sports and twenty-one club sports. Upon graduation, West Point, cadets earn a Bachelor of Science degree and become commissioned as second lieutenants in the U.S. Army. :
Approximately 200 of the 1,300 cadets in Doe’s entering class were women. Doe was often the only woman in a squad of approximately ten cadets. During her time at West Point, she was subjected to pervasive sexual harassment and a culture of sexual violence. Her classmates regularly made misogynistic and sexually aggressive comments, which were frequently ignored and sometimes condoned by West Point administrators, During team-building exercises, cadets would march and sing “sexual, misogynistic chants,” such as the one quoted above, in view and earshot of faculty and administrators. App’x 16. Male cadets often used derogatory terms to describe women and frequently made contemptuous comments about the physical appearance of women. West Point officials ignored or endorsed these comments, and openly joked with male cadets about sexual exploits, Male faculty members routinely expressed sympathy with male cadets over the'lack of opportunities to have sex, and suggested that they seize any chance they could to do so.
There were other disparities in the treatment of male and female cadets. West Point officials required mandatory annual sexually transmitted disease (“STD”) testing for female cadets, but not male cadets, explaining that STDs were more harmful to women than to men and therefore it was the responsibility of women to prevent the spread of these diseases. In the Physical Education program in the first year at West-Point, male cadets were required to take boxing while female cadets were required to take self-defense.
While West Point provided training for the prevention of sexual assault and harassment, the training was inadequate. West Point officials provided only limited training on the concepts of respect and consent, while sending the message to female cadets that it was “a woman’s responsibility” to prevent sexual assault and that “it was their job to say ‘no,’when faced with inevitáble advances from their male colleagues.” App’x 18. West Point officials failed to punish cadets who perpetrated sexual assaults and created an environment in which male cadets understood that they could sexually assault female colleagues with “near impunity,” while female cadets' understood “that they risked their own reputations and military careers” by reporting sexual assaults against them. App’x 18; The vast majority of faculty members and administrators were male.
A 2010 Department of Defense (“DoD”) survey found that fifty-one percent of female cadets and nine percent of male cadets reported that they had experienced sexual harassment at West Point.[5] The *53 survey found that more than nine percent of the female cadets at West Point experienced unwanted sexual. contact in 2010, and some eighty-six percent of these women did not report the incident.[6] Of the female cadets who did not report unwanted sexual contact, seventy-one percent feared “people gossiping about them” and seventy percent “felt uncomfortable” making a report.[7] In 2011, DoD found that West Point was only “partially incompliance” with sexual harassment and assault policies, and that West Point’s prevention training was “deficient,” did not meet the minimum standard of annual training for cadets, lacked an institutionalized comprehensive sexual assault prevention and response curriculum, and failed to comply with DoD directives intended to reduce rape and sexual assault.[8]
Defendants-appellants Lieutenant General Franklin Lee Hagenbeck, the Superintendent of West Point from July 2006 to July 2010, and Brigadier General William E. Rapp, Commander of Cadets at West Point from- 2009 to 2011, were responsible for administering the sexual assault prevention and response program and the training of cadets on campus during the relevant time period. According to the amended complaint, however,' instead of implementing programs and policies to educate and protect students, defendants created, promulgated, implemented, and administered the policies, practices, and customs at issue. The 2009-2010 DoD Annual Report on Sexual Harassment and Violence at Military Service Academies found that trends of unwanted sexual contact experienced by female cadets increased during the time Hagenbeck and Rapp were, respectively, Superintendent and Commander of Cadets.
On May 8, 2010, around 1 a.m., a male cadet stopped by Doe’s dormitory room and invited her for a walk. It was after curfew, and Doe had earlier taken a sedative prescribed to help her sleep because she had been suffering from anxiety and stress. Nonetheléss, she agreed to go with him. They eventually walked into an administrative building and the male cadet began drinking alcohol, offering Doe a few sips. She took them, and then íost consciousness as the alcohol mixed with her medication. The male cadet then took advantage, attacking Doe and having “forcible, non-consensual intercourse with her,” on the concrete floor of a boiler room. App’x 22. She woke up in her own bed a few hours later, with dirt on her clothes *54 and hair, bruises on her lower back, and blood between her legs. Three days later, when she went for a vaginal examination at West Point’s health clinic, there were signs of vaginal tearing. She eventually left West Point, enrolling at a four-year college from which she earned a degree.
Doe brought this action below against the United States under the Federal Tort Claims Act (the “FTCA”), 28 U.S.C. §§ 1346(b), 2671 et seq., and the Little Tucker Act, 28 U.S.C. § 1346(a)(2), as well as against Hagenbeck and Rapp in their individual capacities under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), for due'process and equal protection violations. The district court dismissed the claims against the United States as well as the due process claim, and permitted Doe to pursue only her equal protection claim against the individual defendants. The district court held that the Feres doctrine did not bar the equal protection claim and that, the individual defendants were not entitled to qualified immunity. Only the district court’s denial of defendants’ motion to dismiss the equal protection claim is before us on this interlocutory appeal.[9]
II.
A. Equal Protection
Since 1971, the Supreme Court “has repeatedly recognized that neither federal nor state government acts compatibly with the equal protection principle when a law or official policy denies to women, simply because they are women, full citizenship stature—equal opportunity to aspire, achieve, participate in and contribute to society based on their individual talents and capacities.” United States v. Virginia, 518 U.S. 515, 532, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (“VMI”) (citing, inter alia, Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971)). In VMI, the Court held that Virginia’s policy of excluding women from enrolling in its historically single-sex military college • violated the Equal Protection Clause of the Fourteenth Amendment. 518 U.S. at 534, 116 S.Ct. 2264. Similarly, in Mississippi University for Women v. Hogan, 458 U.S. 718, 733, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982), the Court held that a state university’s policy of admitting only women to its nursing programs violated the Equal Protection Clause.
These principles apply not just to gender discrimination in admissions to educational institutions but to the continued treatment of students after they have been admitted. See, e.g., Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246, 258, 129 S.Ct. 788, 172 L.Ed.2d 582 (2009) (holding plaintiffs could pursue claims against school system and superintendent for “unconstitutional gender discrimination in schools” under § 1983, where defendants purportedly failed to address sexually harassing conduct by another student). Courts have thus recognized equal protection claims where' gender discrimination created a hostile educational environment. See, e.g., Hayut v. State Univ. of New York, 352 F.3d 733, 743-46 (2d Cir. 2003) (allowing § 1983 equal protection claim by student against professor for hostile educational environment created by “derogatory and sexually-charged comments”). Moreover, the Supreme Court has recog *55 nized a Bivens claim for gender discrimination, holding that the Equal Protection Clause of the Fifth Amendment confers “a federal constitutional right to be free from gender discrimination.” Davis v. Passman, 442 U.S. 228, 235, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) (holding that former congressional staff member could sue U.S. Congressman for damages under Fifth Amendment for discriminating against her on basis of sex).
Equal protection and other constitutional principles have been applied to the military and military institutions. In Frontiero v. Richardson, the Court held that a statutory scheme for housing allowances and spousal medical and dental benefits that applied different standards for male and female active service members was “constitutionally invalid.” 411 U.S. 677, 688, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973). See also Fitzgerald, 555 U.S. at 257, 129 S.Ct. 788 (observing that students at “military service schools and traditionally single-sex public colleges,” which are exempt from Title IX of Educational Amendments of 1972, 20 U.S.C. § 1681(a), could bring § 1983 claims for violation of equal protection clause); VMI, 518 U.S. at 535-36, 547-54, 116 S.Ct. 2264; Schlesinger v. Ballard, 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975) (rejecting, but reaching merits, of claim challenging different discharge policies for male and female officers, based on then-existing exclusion of women from combat roles). In Crawford v. Cushman, we observed that “a succession of cases in this circuit and others had reiterated the proposition that the military is subject to the Bill of Rights and its constitutional implications,” 531 F.2d 1114, 1120 (2d Cir. 1976); see also Dibble v. Fenimore, 339 F.3d 120, 128 (2d Cir. 2003) (“We decline to adopt a categorical rule on the justicia-bility of intramilitary suits.”).
The military has itself adopted regulations to address the issue of gender discrimination and sexual harassment. Army regulations unambiguously prohibit sexual harassment, and commanders and supervisors are obliged to ensure that sexual harassment is not tolerated.[10] All military academies (including West Point) must comply with regulations promulgated by DoD as part of its Sexual Assault Prevention and Response Program.[11]
Hence, Doe was entitled, under the Fifth Amendment and the Army’s own regulations, to an environment free from gender discrimination and sexual harassment.
B. The Feres Doctrine
In 1950, the Supreme Court held in Feres v. United States that “the Government is not liable under the [FTCA] for *56 injuries to servicemen where the injuries arise out of or are in the course of activity incident to service.” 340 U.S. at 146, 71 S.Ct, 163. Feres involved three cases, brought by or on behalf of servicemen against the United States for personal injuries, sustained “while on active duty and not on furlough,” purportedly caused by the “negligence of others in the armed forces.” Id. at 137-38, 71 S.Ct. 153. In two of the cases, death resulted. Id. at 137, 71 S.Ct. 153. The Court held that Congress did not intend to subject the Government to tort claims “by a member of the armed services.” Chappell v. Wallace, 462 U.S. 296, 299, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983) (interpreting Feres).
The Court later extended the concept of intramilitary immunity to Bivens claims. A Bivens remedy is not available when “special factors counseling hesitation” are present. Bivens, 403 U.S. at 396, 91 S.Ct. 1999; see Ziglar v. Abbasi, — U.S. —, 137 S.Ct. 1843, 1857, 198 L.Ed.2d 290 (2017) (“The Court’s precedents now make clear that ⅞ Bivens remedy will not be available if there are ‘special factors counseling hesitation in the absence of affirmative action by Congress.’ ” (citation omitted)). In Chappell, the Court recognized that “the unique disciplinary structure of the military establishment and Congress’ activity in the field constitute ‘special factors’ which dictate that it would be inappropriate to provide enlisted military personnel a Bivens-type remedy against their superior officers.” Chappell, 462 U.S. at 304, 103 S.Ct. 2362; see also United States v. Stanley, 483 U.S. 669, 683-84, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987) (recognizing that rationales for intramilitary immunity as explained in Feres are “special factors” counseling against Bivens relief, and “holding that no Bivens remedy is available for injuries that ‘arise out of or are in the course of activity incident to service’”) (quoting Feres, 340 U.S. at 146, 71 S.Ct. 153).
At the same time, however, “our citizens in uniform may not be stripped, of basic civil rights simply because they 'have doffed their civilian clothes.” Earl Warren, The Bill of Rights and the Military, 37 N.Y.U. L. Rev. 181, 188 (1962) (quoted in Chappell, 462 U.S. at 304, 103 S.Ct. 2362). As the Court noted in Chappell-. “This Court has never held, nor do we now hold, that military, personnel are barred from all redress in civilian courts for constitutional wrongs suffered in the course of military service,” 462 U.S. at 304-05, 103 S.Ct. 2362. Indeed, members of the military have been permitted, after Feres, to bring constitutional challenges against the Government with respect to matters relating to the military. See Frontiero, 411 U.S. at 688, 93 S.Ct. 1764; accord Regan v. Starcraft Marine, LLC, 524 F.3d 627, 640-41 (5th Cir. 2008) (Feres did not bar suit brought by service member “engaged in purely recreational activity” “not related to any tactical or field training,” even where recreational facility was provided “to improve the morale and welfare” of service members); Crawford, 531 F.2d at 1125-27 (holding, where servicewoman was discharged from Marines because she was pregnant, that her rights to equal • protection and due process were violated, and qrdering award of damages), See also Schlesinger, 419 U.S. at 508-10, 95 S.Ct. 572; Parker v. Levy, 417 U.S. 733, 758-60, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974) (rejecting, but reaching merits of, First Amendment challenge brought by Army captain convicted by general court-martial of violations of Unifdrm Code of Military Justice, and • observing that “the members of the military are not excluded from the protection granted by the First Amendment”).
In cases decided after Feres, the Court has explained the “broad rationales” un *57 derlying its determination that soldiers may not maintain tort suits against the Government or members of the military for injuries arising incident to military service. United States v. Johnson, 481 U.S. 681, 688, 107 S.Ct. 2063, 95 L.Ed.2d 648 (1987). First, there is a “unique relationship between the Government and military personnel,” Chappell, 462 U.S. at 299, 103 S.Ct. 2362, that is “ ‘distinctively federal in character.’ ” Johnson, 481 U.S. at 689, 107 S.Ct. 2063 (quoting Feres, 340 U.S. at 143, 71 S.Ct. 153). The military function is performed “in diverse parts of the country and the world,” and when a service member is injured “incident to service—that is, because of his military relationship with the Government”—a uniform federal remedy should be available, and “the fortuity of the situs of the alleged negligence” should not dictate whether the Government is liable. Id.
Second, Congress has established alternative, statutory means of compensation for military-personnel injured-incident to service. As the Court observed in Johnson, “the existence of these generous statutory disability and death benefits is an independent reason why the Feres doctrine bars suit for service-related injuries.” Id. It is not likely, the Court has concluded, that Congress would have created “ ‘systems of simple, certain, and uniform compensation for injuries or death of those in the armed services’” while intending at the same time to permit lawsuits for service-related injuries under the FTCA. Chappell, 462 U.S. at 299, 103 S.Ct. 2362 (quoting Feres, 340 U.S. at 144, 71 S.Ct. 153).[12]
Third, suits based upon service-related activity “‘would involve the judiciary in sensitive military affairs at the expense of military discipline and effectiveness.’ ” Johnson, 481 U.S. at 691, 107 S.Ct. 2063 (quoting Shearer, 473 U.S. at 57, 105 S.Ct. 3039). Courts should not intrude in military matters, the Court has explained, because “a suit based upon service-related activity necessarily implicates the- military judgments and decisions that are inextricably intertwined with the conduct of the military mission.” Johnson, 481 U.S. at 691, 107 S.Ct. 2063; see United States v. Shearer, 473 U.S. 52, 59, 105 S.Ct. 3039, 87 L.Ed.2d 38 (1985) (“Feres seems best explained by the peculiar and special relationship of the soldier to his superiors, the effect of the maintenance of such suits on discipline, and the extreme results that might obtain if suits ... were allowed for negligent orders given or negligent acts committed in the course of military duty.”) (internal quotation marks omitted).
In Taber v. Maine, after reviewing the Supreme Court case law,'we summarized the various considerations and held that:
an appropriate test for applying the Feres doctrine .must respect: (1) the Supreme Court’s stated concern for keeping courts away from, delicate questions involving military discipline; (2) Feres’s clear -intention to replace the contingencies of local tort law with a uniform federal scheme; and (3) Feres’s original desire that this uniforihity is to be achieved through exclusive recourse to *58 the federal system of military death and disability benefits.
67 F.3d 1029, 1049 (2d Cir. 1995).
In Taber, the plaintiff Taber was a Navy “Seabee”—a construction worker—who was injured in Guam when his car was struck by a car driven by another Navy serviceman, Maine. Id. Both were on active duty but on liberty, and the accident occurred on a public road. Id. Taber had spent the day with his companion and they were driving back to her home for the weekend when the accident occurred. Id. He sued the United States and Maine for his injuries, which he alleged were caused by Maine’s negligent driving. Id. The Government defended in part by relying on the Feres doctrine, and the district court agreed, dismissing the claims. Id. at 1033.
On appeal, the Second Circuit reversed, holding that “the link between Taber’s activity when he was injured and his military status is too frail to support a Feres bar.” Id. at 1050. The Court explained that “[t]here is nothing characteristically military about an employee who, after working-hours are done, goes off to spend a romantic weekend with a companion.... The accident that followed, on the open road and on the way to [the companionj’s house[,] had ‘nothing to do with’ Taber’s military career and was ‘not caused by service except in the sense that all human events depend upon what has already transpired.’” Id. at 1051 (quoting Brooks v. United States, 337 U.S. 49, 52, 69, 69 S.Ct. 918, 93 L.Ed. 1200 (1949)).
Taber teaches us that military status does not automatically trigger Feres immunity. Rather, we apply the incident to service test by asking whether, at the time the plaintiff was injured, she was “engaged in activities that fell within the scope of [her] military employment.” 67 F.3d at 1050. In Wake v. United States, we reiterated that we must look at “the totality of the germane facts,” and noted that “[i]n examining whether a service member’s injuries were incurred ‘incident to service,’ the courts consider various factors, with no single factor being dispositive.” 89 F.3d at 57-58. In addition to “[t]he individual’s status as a member of the military at the time of the incident,” those factors include: “the relationship of the activity to the individual’s membership in the service”; “the location of the conduct giving rise to the underlying tort claim”; “whether the activity is limited to military personnel and whether the service member was taking advantage of a privilege or enjoying a benefit conferred as a result of military service.” Id. at 58.[13]
C. Application of the Feres Doctrine to this Case
In my view, the Feres doctrine does not bar Doe’s Bivens claim that she was denied her constitutional right to equal access to education, for her injuries did not arise “incident to service.” First, as .to the *59 activities immediately preceding Doe’s rape, her ultimate injury, she was engaged in purely recreational activity: she was out for an evening walk on a college campus, after curfew, with another student who was a friend. Second, as to her broader activities at West Point, she was a student attending college: she was taking classes, participating in extracurricular activities, and learning to grow up and to be a self-sufficient and healthy individual. She was not a soldier on a battlefield or military base. She was not traveling in a military car or boat or plane or pursuant to military orders. She was not being treated by military doctors. She was not on duty or in active service or on active status, and she was not yet obliged to enter into military service. There was “nothing characteristically military” about what she was doing, and her injuries did not arise out of military employment.
To be sure, West Point serves, to some extent, a military purpose, and its cadets are indeed being trained to be soldiers and officers. As the Government and the majority note, West Point cadets are considered members of the military. Appellants’ Br. at 14; Maj. Op. at 44-45 (citing 10 U.S.C. § 3075(a)-(b)(2) (including “cadets of the United States Military Academy” in the “Regular Army,” “a component of the Army”)). But Doe’s status as a member of the military is not, by itself, dispositive. See Wake, 89 F.3d at 58-61 (declining to attribute dispositive weight to plaintiffs status as a cadet but looking at all germane circumstances); Taber, 67 F.3d at 1053 (holding that Feres was not a bar where “[ojther than the naked fact that Taber was in the Navy at the time of his injury, there is no government/plaintiff relationship of any significance in this case”). Rather, West Point functions principally as a school and Doe was primarily a student; the concerns underlying the Supreme Court’s decision in Feres and the “special factors counseling hesitation” in the in-tramilitary immunity cases simply are not implicated here.
First, Doe’s claims do not implicate “delicate questions involving military discipline.” Taber, 67 F.3d at 1049. Her claims do not call into question “the military judgments and decisions that are inextricably intertwined with the conduct of the military mission.” Johnson, 481 U.S. at 691, 107 S.Ct. 2063. The actions and decisions of the individual defendants being challenged here do not implicate, except perhaps in the most abstract sense, military discipline or military judgment or military preparation.[14] Instead, Doe’s *60 claims challenge academic decisions and policies, and the individual defendants were acting as educators and school administrators, tasked with providing their students with a positive learning environment, one free from sexual discrimination and harassment. See VMI, 518 U.S. at 532, 116 S.Ct. 2264 (recognizing right to equal protection in education, including at a military educational institution); Hagopian v. Knowlton, 470 F.2d 201, 210 (2d Cir. 1972) (comparing West Point’s responsibility for instilling discipline in cadets “to the responsibilities of public school teachers to educate their students”).
Second, the “federal system of military death and disability benefits” established by Congress for injuries sustained by military personnel incident to service, Taber, 67 F.3d at 1049, apparently is not available to Doe. Indeed, now that her claims against the United States have been dismissed, it appears that her Bivens claim is her only means of seeking relief for her injuries. The Government has not suggested that Doe is eligible for any benefits akin to workers’ compensation benefits for injuries arising out of activities within the scope of her military duties.
Third, the district court’s decision to permit Doe to proceed with her federal constitutional claim does not implicate the Court’s concern that a “uniform federal scheme” not be displaced by “the contingencies of local tort law.” Taber, 67 F.3d at 1049. Federal constitutional rights are at stake, and “the fortuity of the situs of the alleged [wrongdoing]” will not dictate whether the individual defendants will be liable. Johnson, 481 U.S. at 688, 107 S.Ct. 2063. Rather, Doe’s equal protection claim is a federal claim, based on federal constitutional law: the Equal Protection Clause of the Fifth Amendment.
Moreover, there are federal regulations that also apply here, and Doe alleges that defendants failed to abide by them. The concern identified in Feres and its progeny that courts not interfere with military discipline and structure carries.little weight when the military is violating its own rules and regulations. See Crawford, 531 F.2d at 1120 (noting that “[a] line of cases in our court holds that actions by the armed services that are violative of their own regulations are within the reach of the courts”) (collecting cases); Hammond v. Lenfest, 398 F.2d 705, 715 (2d Cir. 1968) (permitting review of petition for writ of habeas corpus where naval reservist claimed he was denied discharge by Navy in violation of its own regulations). Judicial review of Doe’s allegations that the individual defendants failed to follow mandatory military directives and regulations would not unduly interfere with “the proper and efficient operation of our military forces.” Smith v. Resor, 406 F.2d 141, 146 (2d Cir. 1969).
The Government cites three cases that have applied the Feres doctrine to dismiss claims brought by service academy cadets. See Appellants’ Br. at 14 (citing Miller v. United States, 42 F.3d 297, 301 (5th Cir. 1995); Collins v. United States, 642 F.2d 217, 218 (7th Cir. 1981); Archer v. United States, 217 F.2d 548, 552 (9th Cir. 1954)). These out-of-circuit cases, of course, are not controlling, and they are in any event distinguishable. In Miller, a freshman midshipman at the Naval Academy was hit in the head by the boom of a sailboat while training to learn, inter alia, seamanship and the handling of a small vessel. 42 F.3d at 299. In Collins, an Air Force cadet alleged that he was injured by medical malpractice on the part of Air Force medical personnel. 642 F.2d at 218. In Archer, a West Point cadet was aboard a United States Army plane returning to West *61 Point from a leave. He was being transported as “a soldier in military service in line of duty” and was killed when the plane crashed. His parents brought a wrongful death action against the United States, alleging negligence in the operation of the plane. 217 F.2d at 549, 551.
These factual scenarios are significantly different from the circumstances before us now. Injuries resulting from training aboard a Navy boat or flying on an Army plane or being treated by military doctors clearly are injuries incident to service. None of the cases involved a claim for the violation of constitutional rights, see Harlow v. Fitzgerald, 457 U.S. 800, 814, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (damages suits “may offer the only realistic avenue for vindication of constitutional guarantees”), and none involved a claim for the deprivation of the opportunity for an equal education, or a claim of an injury sustained while socializing with a classmate. Moreover, in all three cases, the armed forces provided disability or death benefits or other compensation. Miller, 42 F.3d at 299-300, 306, 307; Collins, 642 F.2d at 221; Archer, 217 F.2d at 550.
Finally, the majority and the Government rely on two recent decisions of other Circuits rejecting Bivens claims brought by current and former service members alleging they had been raped and sexually assaulted by other service members. The plaintiffs in these cases contended that the actions and omissions of current and former Secretaries of Defense had created a military culture of tolerance for sexual assault and misconduct. See Klay v. Panetta, 758 F.3d 369, 371-72 (D.C. Cir. 2014); Cioca v. Rumsfeld, 720 F.3d 505, 513-14 (4th Cir. 2013). The cases, however, are distinguishable, for they involved active duty service members who brought broad challenges to policies of high-ranking government officials, raising questions as to military discipline and command for those in active duty. The cases did not involve students or an educational institution or the deprivation of meaningful access to an education because of discriminatory academic policies or school administrators tasked with running an educational institution. The Feres concerns—particularly the question of interfering with military command and discipline—play out very differently in this scenario.[15] As Justice Brennan wrote in Stanley:
In Chappell, the Court did not create an inflexible rule, requiring a blind application of Feres in soldiers’ cases raising constitutional claims. Given the significant interests protected by Bivens actions, the Court must consider a constitutional claim in light of the concerns underlying Feres. If those concerns are not implicated by a soldier’s constitutional claim, Feres should not thoughtlessly be imposed to prevent redress of an intentional constitutional violation.
483 U.S. at 705, 107 S.Ct. 3054 (Brennan, J., concurring in part and dissenting in part, with Marshall, J., joining, and Stevens, J., joining in relevant part).
III.
The Feres doctrine has been criticized wide and far, and many have called for the Supreme Court to reconsider it.[16] While we *62 do not, of course, have the authority to overrule Feres, we should not be extending the doctrine. See Lombard v. United States, 690 F.2d 215, 233 (D.C. Cir. 1982) (Ginsburg, J., concurring in part and dissenting in part) (“While lower courts are bound by the Supreme Court’s decision in Feres, they are hardly obliged to extend the limitation.... ”). By holding that Doe’s injuries sustained as a cadet incident to being a student are barred as injuries incident to military service, the majority does precisely that.
I would affirm the district court’s determination that the Feres doctrine does not bar Doe’s equal protection claim. Accordingly, I dissent.

. Letter from Col. Deborah J. McDonald, West Point Director of Admissions, to High School Seniors, http://www.usma.edu/ admissions/Shared% 20Documents/COL-web-letter.pdf; see also United States Military Academy, http://www.westpoint.edu/ (last visited Aug. 29, 2017) ("The Academy provides a superb four-year education, which focuses on the leader development of cadets in the academic, military, and physical domains, all underwritten by adherence to a code of hon- or.").

. "Fourth and Third Classmen (First and Second Years). A fourth or third classman disen-rolled will retain their MSO [Military Service obligation] in accordance with 10 U.S.C. chapter 47 and DoD Instruction 1304.25 but have no active duty service obligation (ADSO).” 32 C.F.R. § 217.6(f)(6)(ii)(A) (emphasis added). See also 32 C.F.R. § 217.4(d) ("Cadets and midshipmen disenrolling or those disenrolled after the beginning of the third academic year from a Service academy normally will be called to active duty in enlisted status, if fit for service.”) (emphasis added).

.West Point Curriculum, http://www.usma. edu/curriculum/SitePages/Home.aspx.

. The Middle States’ Commission on Higher Education conducts accreditation activities for institutions of higher education in states in the mid-Atlantic region, including New York. Middle States Commission on Higher Education, http://www.msche.org/ (last visited Aug. 29, 2017). West Point is one of many institutions accredited by the organization. See Institution Directory, Middle States Commission on Higher Education, http://www. msche.org/institutions_directory.asp (last visited Aug. 29, 2017).

. See Paul J. Cook & Rachel N. Lipari, Defense Manpower Data Center, 2010 Service *53 Academy Gender Relations Survey, at iv-v (2010), http://www.sapr.mil/public/docs/ research/FINAL_SAGR_2010_Overview_ Report.pdf.

. Id. at iv-v.

. Id. at v. Underreporting of sexual violence on college campuses is a significant issue. See Laura L. Dunn, Addressing Sexual Violence in Higher Education: Ensuring Compliance with the Clery Act, Title IX and VAWA, 15 Geo. J. Gender & L. 563, 566 (2014).

. The statistics at West Point are representative of a large-scale epidemic of sexual assault and harassment of women on college campuses around the country. A 2006 study concluded that ‘‘[o]ne in five women is sexually assaulted while in college." See White House Task Force To Protect Students from Sexual Assault, Not Alone: The First Report of the White House Task Force to Protect Students from Sexual Assault 6 (2014), https://www. justice.gov/ovw/page/file/905.942/download. A 2015 survey of 27 U.S. universities by the Association of American Universities found that approximately one-third of female undergraduates reported experiencing non-consensual sexual contact at least once. David Cantor et ah, Westat, Report on the Association of American Universities Campus Climate Survey on Sexual Assault and Sexual Misconduct, at xi (2015), http://www.aau.edu/uploadedFiles/ AAU_Publications/AAU_Reports/SexuaL Assault_Campus_Survey/AAU_Campus_ Climate_Survey_l 2_14_15 .pdf.

. Because the majority holds that Doe’s equal protection claims are barred by the Feres doctrine, it does not reach the Government’s alternative argument that the individual defendants are entitled to qualified immunity. Accordingly, I do not discuss the qualified immunity issue, but simply note that I believe the district court correctly rejected the defense at the motion-to-dismiss stage.

. See, e.g., U.S. Army Reg. 600-20, Ch. 7-3(a) (Mar. 18, 2008) ("The policy of the Army is that sexual harassment is unacceptable conduct and will not be tolerated.”); id. Ch. 7-3(b) ("The POSH [Prevention of Sexual Harassment] is the responsibility of every Soldier. ... Leaders set the standard for Soldiers ... to follow,”); id. Ch. 7-2(a) ("Commanders and supervisors will ... [e]nsure that assigned personnel ... are familiar with the Army policy on sexual harassment.”); id. Ch. 7-2(d) ("Commanders and supervisors will ... [s]et the standard.”); id. Ch. 7-4(a) (defining "sexual harassment” to include physical or verbal conduct); id. Ch. 7-6(b) ("A hostile environment occurs when Soldiers or civilians are subjected to offensive, unwanted and unsolicited comments, or behaviors of a sexual nature [including] for example, the use of derogatory gender-biased terms, comments about body parts, suggestive pictures, explicit jokes, and unwanted touching.”). Army regulations expressly acknowledge that "[s]exual harassment is a form of gender discrimination,” Id. Ch. 7-4.

. See 32 C.F.R, § 103.5; U.S. Dep't of Def. Dir. 6495.01 (Jan. 23, 2012), https://www.hsdl.org/?abstract& did=761622.

. In subsequent cases, the courts have recognized that “the presence of a compensation system, persuasive in Feres, does not of necessity preclude a suit for negligence.” United States v. Muniz, 374 U.S. 150, 160, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963) (citing United States v. Brown, 348 U.S. 110, 75 S.Ct. 141, 99 L.Ed. 139 (1954)); see also Taber v. Maine, 67 F.3d 1029, 1039 (2d Cir. 1995) (“Indeed, the Supreme Court and several circuit courts (without reproof from the Supreme Court) have subsequently ... allowed FTCA claims in a significant number of cases in which the injured plaintiffs were fully covered by the government’s compensation scheme.”).

. In Wake, we applied Feres to bar claims brought by a student in the Reserve Officers Training Corps at a nonmilitary college. 89 F.3d at 55. The student was an enlisted inactive member of the Navy Reserves who was assigned to “temporary duty” to travel to a military clinic for a physical examination required to qualify as a flight navigator. Id. at 56. On the way back, while traveling in a military vehicle driven by a Marine Corps sergeant, she was injured. Id. at 55-56. We concluded, not surprisingly, that the student's injuries were sustained incident to service. See id. at 58-61. While Wake was indeed a student, she was on a "temporary duty” assignment and was traveling in a military vehicle driven by an active service member. Moreover, she received military benefits for her injury—she “was assigned a 100% disability rating from the [Veterans Administration] on January 5, 1993, resulting in monthly VA service-connected compensation benefits of approximately $2,000 per month.” Id. at 62.

. The Government argues that Doe's claims "call[] into question the management of the military,” "specifically their decisions concerning the discipline, supervision, and control of West Point cadets.” Appellants' Br. at 10. I suppose that may be so to a degree, but our observation in Taber applies here: "Arguably, there is some government/tortfeasor relationship that might entail minimal disciplinary concerns even in this case, but these are both qualitatively and quantitatively different from those that concerned us in [other cases implicating Feres], let alone those that troubled the Supreme Court in Shearer." 67 F.3d at 1053. Moreover, as amici point out, many graduates of military academies use their degrees to pursue other professional, non-military endeavors immediately after meeting minimum service requirements. See Amicus Br. of Former Military Officers at 10 (citing Government Accountability Office study reporting that 32% and 38% of academy graduate officers in, respectively, 2001 and 2005 left in their fifth year, the first year officers were eligible to leave the military). While a four-year college degree is required to be commissioned as an Army officer, admission to West Point is not; in fact, in Fiscal Year 2011, only 14.6% of Army officers were commissioned by attending West Point. See Ami-cus Br. of Former Military Officers at 11 (citing Table B-31: Active Component Commissioned Officer Corps, FY 11, http:// prhome.defense.gov/Portals/52/Documents/ *60 POPREP/poprep201 l/appendixb/b_31 .html (last visited Aug. 29, 2017)).

. Klay and Cioca are also distinguishable because they do not employ the fact-specific, totality-of-circumstances approach our Circuit applied in Taber and Wake. Instead, they rely primarily on one consideration: military discipline and decisionmaking. See Klay, 758 F.3d at 374-75; Cioca, 720 F.3d at 512-15.

. See, e.g., Lanus v. United States, — U.S. -, 133 S.Ct. 2731, 2732, 186 L.Ed.2d 934 (Thomas, J., dissenting from denial of certio-rari) ("I would grant the petition to reconsider Feres....”); Ortiz v. United States, 786 F.3d 817, 818 (10th Cir. 2015) ("[T]he facts here exemplify the overbreadth (and unfairness) of *62 the doctrine, but Feres is not ours to overrule.”); France v. United States, 225 F.3d 658 (6th Cir. 2000) (per curiam) ("[Mjany courts and commentators have strongly criticized the Feres decision.”); Day v. Mass. Air. Nat'l Guard, 167 F.3d 678, 683 (1st Cir. 1999) ("Possibly Feres ... deserves reexamination by the Supreme Court.”); Bozeman v. United States, 780 F.2d 198, 200 (2d Cir. 1985) ("The Feres doctrine is a blunt instrument; courts and commentators have often been critical of it.”); Taber, 67 F.3d at 1044 n.11 ("The fact that the doctrine can be made workable does not suggest that the Supreme Court ought not abandon the doctrine completely for reasons akin to those given by Justice Scalia in his Johnson dissent.”); 14 Charles Alan Wright et al., Federal Practice & Procedure § 3658 (4th ed. 2015) ("The Feres doctrine has been called ‘much-criticized’ and 'controversial.' ”); Erwin Chemerinsky, Federal Courts Jurisdiction 674 (6th ed. 2012) (noting that many commentators and courts have "sharply criticized” the Feres doctrine for causing "manifest injustice”).